# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# WESTERN DIVISION
# NO: 5:09-CR-00216-FL-5

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| DYLAN BOYD ) | |
| ) | |
| _____ ) | |

This Cause comes before the Court upon Defendant's motion to suppress all statements he made to two FBI agents following his arrest on July 27, 2009. [DE-952]. The Government has responded [DE-984], a hearing was held, and the matter is accordingly ripe for review. The motion to suppress was referred to the undersigned on May 19, 2011 for entry of a memorandum and recommendation. For the reasons stated herein, the undersigned recommends the motion to suppress be denied.

## I. Background

Defendant Dylan Boyd is charged with conspiracy to provide material support to terrorists, conspiracy to murder, kidnap maim and injure persons, and illegal sale of firearms. [DE-145, DE-670]. Defendant, his father, his brothers, and several other individuals were the subjects of a three-year investigation by the Federal Bureau of Investigation ("FBI"), the details of which are summarized in this Court's order of detention [DE-112] and need not be repeated here. Defendant was arrested, along with his father and brothers, on July 27, 2009. Following his arrest, Defendant waived his *Miranda* rights and gave a statement he now seeks to suppress.

The undersigned held an evidentiary hearing on Defendant's motion on May 23, 2011

[DE-996], at which the Government presented the following:

Special Agent Paul Minella ("SA Minella") of the FBI, one of the primary agents assigned to the investigation, testified on behalf of the Government. At the time of the hearing, SA Minella had twelve years' experience as an FBI agent, and ten years' experience as a police officer with the city of Pittsburgh. [Transcript of Hearing ("T."), p.2].

On July 27, 2009, members of the FBI Hostage Rescue Team carried out a carefully formulated plan to arrest Dylan Boyd and the other defendants at a warehouse in Durham, North Carolina. As SA Minella explained, the three-year investigation had led agents to "believe that the subjects that were arrested on the date in question were armed, espoused violent jihad ideology, and indicated repeatedly that when the authorities would come to arrest them, or if they would be arrested, they would resist to the utmost." [T.p.3]. The plan was "to separate the father, Daniel, from the sons at the arrest site, to split them up so we could have two separate arrest teams." [T.p.5]. A cooperating witness lured Daniel Boyd into the warehouse while a second cooperating witness remained outside with Defendant and his brothers. As one team executed the arrest of Daniel Boyd inside the warehouse, the second team simultaneously carried out the arrests of Defendant and the other defendants. When members of the Hostage Rescue Team approached Defendant and ordered him to get on the ground and show his hands, he did not comply. A special agent handling an FBI canine "gave repeated commands [to Defendant] to get down on the ground or else the dog would be released." [T.p.9]. Defendant, who was armed with a loaded Beretta semi-automatic pistol holstered on the right side of his body, again failed to comply. The handler released the dog, which bit Defendant on his upper right arm and pulled him to the ground. An agent also physically forced Defendant to the ground. Once down, Defendant stopped

2

struggling and the dog was taken off him. The agents handcuffed Defendant and secured his pistol. A medic on scene immediately rendered first aid to the bite wound on Defendant's arm and to an abrasion he sustained on his back.

Although SA Minella did not participate in the arrest, he arrived on the scene shortly after the medic bandaged Defendant's injuries. Defendant was then transported to the Durham police station. SA Minella placed Defendant in the vehicle but could not recall whether he personally accompanied Defendant on the ten-minute drive. When they arrived, agents placed Defendant in a conference room in the investigations squad area for the Durham police department. Defendant was seated at a table, shackled, with one hand handcuffed to his chair. The door to the conference room was closed, and a Durham police officer was stationed outside the room.

SA Minella and a second agent, Special Agent Robert Richards ("SA Richards"), entered the conference room and sat down on the same side of the table as Defendant. Before beginning the interview, SA Minella identified himself and SA Richards, explained the purpose of the interview, informed Defendant of the charges he faced, and told him they needed to advise him of his rights before they could talk with him. [T.p.19]. SA Minella presented Defendant with a printed advice of rights form and read it aloud to him. *Id.* Defendant appeared to read the document. He then agreed to speak with the agents and signed the advice of rights form, as did SA Minella and SA Richards. A copy of the advice of rights form signed by Defendant was introduced into evidence as Government's Exhibit No. 12. [DE-998].

SA Minella inquired about Defendant's arm and offered to obtain additional medical treatment for the injury. Defendant refused, however, stating that he preferred to first complete the interview. SA Minella conducted the interview while SA Richards took notes. SA Richards

used his notes to create a standard report of the interview, known as an FBI Form 302. The Form 302 was finalized and signed the following day, July 28, 2009.

SA Minella began the interview by reviewing with Defendant "the facts of what he knew about the individuals that were arrested" and his relationship to them. [T.p.21]. The interview progressed smoothly until SA Minella began "touch[ing] on issues surrounding his family and the ideology of jihad" at which point Defendant became "very defensive and argumentative." [T.p.21]. Defendant explained his idea of jihad as "fighting" that was "necessary to defend Muslims" against the "kuffar," which Defendant defined as "any non-Muslim." [T.p.22]. Defendant stated he did not recognize the American government because it "was a kuffar government." [T.p.23]. At some point during the interview, the agents began to suspect Defendant was being untruthful with them, based on inconsistencies between his statements and the information they had gathered during the course of the investigation. SA Minella then emphasized to Defendant the seriousness of the charges he faced and told him "that cooperation is usually beneficial to the defendant." [T.p.25]. SA Minella informed him that "as agents, [they] could not promise anything; however, when cooperation is given by an individual [they] are interviewing, [they] make sure the United States Attorney's Office is aware of that cooperation" although it was "up to the United States Attorney's Office and ultimately the judge to determine how that cooperation helps a defendant." [T.pp.25-26]. SA Minella denied making any other statements concerning cooperation and specifically denied making any type of promises of leniency to Defendant.

The interview ended when Defendant became agitated in response to repeated questioning regarding his father and brothers. Defendant stated, "I don't want to speak with you any further"

4

[T.p.27], at which point the agents ceased their interrogation and transported Defendant to Durham Regional Hospital for additional treatment of his injuries. The interview lasted approximately two and a half hours.

During cross-examination, SA Minella agreed that he told Defendant "he faced being put away for the rest of [his] life in a high security prison on these charges." [T.p.38]. He denied, however, making this statement at the beginning of the interview and remembered it occurring later, after the agents sensed Defendant was being untruthful. At that point, SA Minella stressed to Defendant the seriousness of the charges and told him several times that "truthfulness can only help." [T.p.46]. SA Minella admitted that his statements to Defendant regarding truthfulness and cooperation were not reflected in the FBI Form 302. Defendant presented no evidence at the hearing, other than a copy of the FBI Form 302, introduced as Defendant's Exhibit No. 1. [DE-998].

SA Minella unequivocally denied (1) telling Defendant "I am here here to help you, not hurt you. The person that talks to us first and who says the most is the person who gets off the easiest[;]" and (2) characterizing the *Miranda* waiver form as "an agreement that we're going to help you out and you are going to cooperate with us." [T.p.54]. When asked whether he had made such a statement not only to Defendant, but to any person he had ever interviewed, SA Minella replied, "Absolutely not." [T.p.54].

Defendant now asks this Court to suppress the statements he made to SA Minella and SA Richards on the grounds that the waiver of his *Miranda* rights and the statement he gave were induced through "coercive and deceptive police promises of leniency." Defendant argues his confession was thereby involuntary under the Fifth Amendment. As discussed *infra*, however,

5

Defendant fails to present any support for his position.

## II. Legal Background

To be admissible, a defendant's statements to law enforcement must be voluntary under the Fifth Amendment. *See* United States v. Braxton, 112 F.3d 777, 780 (4th Cir.) (en banc), *cert. denied*, 522 U.S. 874 (1997). "A statement is involuntary under the Fifth Amendment only if it is 'involuntary' within the meaning of the Due Process Clause." *Id.* In considering the voluntariness of a statement under the Due Process Clause, the court determines "whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976) (per curiam); *see also* United States v. Shears, 762 F.2d 397, 400 (4th Cir. 1985) (quoting Hutto's admonition that a confession is involuntary if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the extension of any improper influence.").

However, "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary." Braxton, 112 F.3d at 780. Instead, the courts consider the totality of the circumstances surrounding the interview to determine "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)); *see also* Braxton, 112 F.3d at 780-81. Courts must conduct the voluntariness inquiry in light of "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Braxton, 112 F.3d at 781 (internal

quotation marks omitted).

"Despite this broad language [of Hutto], the cases indicate that government agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary." Shears, 762 F.2d at 401-02. "Government agents may initiate conversations on cooperation, they may promise to make a defendant's cooperation known to the prosecutor, and they may even be able to make and breach certain promises without rendering a resulting confession involuntary." *Id.* (footnotes omitted). For example, in United States v. Williams, 479 F.2d 1138, 1139-40 (4th Cir.), *cert. denied*, 414 U.S. 1025 (1973), the Fourth Circuit held that the defendant's confession was neither induced nor obtained by any direct or implied promises where the agent suggested that defendant "try to help himself." The court in *Williams* stated that

> [o]nce conversations lawfully begin, we believe a law enforcement officer may properly tell the truth to the accused, and we think it is a fact of criminal life that accused persons can and often do help themselves by cooperating with the police, *e.g.*, if he testifies about the criminal activity of others, he may be granted immunity for his testimony, obtain a dismissal of cumulative counts, or at the very least obtain a recommendation of leniency from the prosecutor.
> *Id.* at 1140.

Notably, "[n]o Supreme Court or Fourth Circuit decision has ever suppressed a defendant's statements on the sole ground that false statements by law enforcement officers to the defendant rendered the statements involuntary." United States v. Rosen, 474 F. Supp. 2d 799, 801 (E.D. Va. 2007). Rather, "courts consider police deception or trickery as one factor to consider in a totality of the circumstances assessment of voluntariness." *Id.*

### III. Analysis

Applying the totality of the circumstances standard, the undersigned concludes that

Defendant's statements were not unconstitutionally coerced. First, SA Minella's statement to Defendant that he could be "put away for the rest of [his] life in a high security prison" offended no constitutional precepts. "[O]nce conversations lawfully begin . . . a law enforcement officer may properly tell the truth to the accused." Williams, 479 F.2d at 1140; *see also* Braxton, 112 F.3d at 782 (same). Informing a suspect that he faces jail time or referring to the maximum penalty for the offense does not render a confession involuntary. *Id.* If convicted of the instant charges, Defendant may be imprisoned for a term of life. *See* Order of Detention, DE-112, p.17. SA Minella's statement to Defendant was therefore truthful and not improper. *See* United States v. Brown, No. 2:10-1096-PMD, 2011 U.S. Dist. LEXIS 40799 at *7-8 (D.S.C. Apr. 14, 2011) (holding that, even if the police told the defendant that all of the occupants in the house would be arrested and a child taken to the Department of Social Services, these statements were truthful statements about the defendant's predicament and were not the type of coercion to render the defendant's subsequent statements involuntary).

With regard to the other two statements Defendant alleges were coercive, there is simply no evidence SA Minella told Defendant that he was "here to help you, not hurt you" or that the *Miranda* waiver form was "an agreement that we're going to help you out and you are going to cooperate with us." The undersigned having heard the direct testimony of SA Minella, his answers on cross-examination, and having observed his demeanor throughout his testimony, finds it to be credible and uncontroverted. The Court concludes there was no evidence of any promises, implicit or otherwise, from SA Minella. Finally, the undersigned finds there was no coercion either from the length of time, the location, or from the other circumstances surrounding Defendant's interview.

## IV. Conclusion

Because Defendant presented no evidence to indicate that the waiver of his *Miranda* rights or his subsequent statements to the interviewing agents were in any manner coerced, he fails to show the confession was involuntary. The undersigned therefore RECOMMENDS that Defendant's motion to suppress [DE-952] be DENIED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Wednesday, June 1, 2011.

*[signature]*

WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE