IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-CR-216-FL-5

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | ORDER |
| DYLAN BOYD, a/k/a "Mohammed," | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion to suppress (DE # 952). The government timely responded in opposition. The motion was referred to United States Magistrate Judge William A. Webb for evidentiary hearing and recommended disposition. In his post-hearing memorandum and recommendation ("M&R") (DE # 1066), the magistrate judge recommends that defendant's motion be denied. For the reasons that follow, this court agrees.

## STATEMENT OF THE CASE

On November 24, 2010, the grand jury returned a second superseding indictment charging defendant, along with seven other men, with conspiracy to provide material support to terrorists in violation of 18 U.S.C. § 2339A, and conspiracy to commit outside of the United States an act that would constitute murder, kidnaping, maiming, and injuring persons in violation of 18 U.S.C. § 956(a). In that indictment, defendant is also charged with knowing sale of a firearm to a convicted felon in violation of 18 U.S.C. § 922(d)(1).

On May 2, 2011, defendant moved to suppress a statement purportedly made by him to law enforcement officers shortly after his arrest on July 27, 2009. Defendant argues that his statement was not "voluntary" under the Fifth Amendment because it was the result of coercive and deceptive

promises of leniency, and that the statement was obtained in violation of Miranda v. Arizona.[1] The government, responding in opposition on May 17, 2011, argued that officers made no promises of favorable intervention and that defendant signed a valid Miranda waiver.

The magistrate judge held an evidentiary hearing on May 23, 2011. Special Agent Paul Minella ("SA Minella") with the Federal Bureau of Investigation ("FBI") testified for the government at hearing, and both sides presented their arguments. On June 3, 2011, the magistrate judge issued his M&R recommending denial of defendant's motion. Neither defendant nor the government filed objection to that recommendation.

## STATEMENT OF THE FACTS

The facts relevant to defendant's motion to suppress, as set forth by the magistrate judge following hearing, are as follows:

> On July 27, 2009, members of the FBI Hostage Rescue Team carried out a carefully formulated plan to arrest Dylan Boyd and the other defendants at a warehouse in Durham, North Carolina. As SA Minella explained, the three-year investigation had led agents to "believe that the subjects that were arrested on the date in question were armed, espoused violent jihad ideology, and indicated repeatedly that when the authorities would come to arrest them, or if they would be arrested, they would resist to the utmost." The plan was "to separate the father, Daniel, from the sons at the arrest site, to split them up so we could have two separate arrest teams." A cooperating witness lured Daniel Boyd into the warehouse while a second cooperating witness remained outside with Defendant and his brothers. As one team executed the arrest of Daniel Boyd inside the warehouse, the second team simultaneously carried out the arrests of Defendant and the other defendants. When members of the Hostage Rescue Team approached Defendant and ordered him to get on the ground and show his hands, he did not comply. A special agent handling an FBI canine "gave repeated commands [to Defendant] to get down on the ground or else the dog would be released." Defendant, who was armed with a loaded Beretta semi-automatic pistol holstered on the right side of his body, again failed to comply. The handler released the dog, which bit Defendant on his upper right arm and pulled him to the ground. An agent also physically forced Defendant to the ground. Once

---

[1] 384 U.S. 436 (1966).

down, Defendant stopped struggling and the dog was taken off him. The agents handcuffed Defendant and secured his pistol. A medic on scene immediately rendered first aid to the bite wound on Defendant's arm and to an abrasion he sustained on his back.

Although SA Minella did not participate in the arrest, he arrived on the scene shortly after the medic bandaged Defendant's injuries. Defendant was then transported to the Durham police station. SA Minella placed Defendant in the vehicle but could not recall whether he personally accompanied Defendant on the ten-minute drive. When they arrived, agents placed Defendant in a conference room in the investigations squad area for the Durham police department. Defendant was seated at a table, shackled, with one hand handcuffed to his chair. The door to the conference room was closed, and a Durham police officer was stationed outside the room.

SA Minella and a second agent, Special Agent Robert Richards ("SA Richards"), entered the conference room and sat down on the same side of the table as Defendant. Before beginning the interview, SA Minella identified himself and SA Richards, explained the purpose of the interview, informed Defendant of the charges he faced, and told him they needed to advise him of his rights before they could talk with him. SA Minella presented Defendant with a printed advice of rights form and read it aloud to him. Defendant appeared to read the document. He then agreed to speak with the agents and signed the advice of rights form, as did SA Minella and SA Richards. A copy of the advice of rights form signed by Defendant was introduced into evidence as Government's Exhibit No. 12.

SA Minella inquired about Defendant's arm and offered to obtain additional medical treatment for the injury. Defendant refused, however, stating that he preferred to first complete the interview. SA Minella conducted the interview while SA Richards took notes. SA Richards used his notes to create a standard report of the interview, known as an FBI Form 302. The Form 302 was finalized and signed the following day, July 28, 2009.

SA Minella began the interview by reviewing with Defendant "the facts of what he knew about the individuals that were arrested" and his relationship to them. The interview progressed smoothly until SA Minella began "touch[ing] on issues surrounding his family and the ideology of jihad" at which point Defendant became "very defensive and argumentative." Defendant explained his idea of jihad as "fighting" that was "necessary to defend Muslims" against the "kuffar," which Defendant defined as "any non-Muslim." Defendant stated he did not recognize the American government because it "was a kuffar government." At some point during the interview, the agents began to suspect Defendant was being untruthful with them, based on inconsistencies between his statements and the information they had gathered during the course of the investigation. SA Minella then emphasized to

3

Defendant the seriousness of the charges he faced and told him "that cooperation is usually beneficial to the defendant." SA Minella informed him that "as agents, [they] could not promise anything; however, when cooperation is given by an individual [they] are interviewing, [they] make sure the United States Attorney's Office is aware of that cooperation" although it was "up to the United States Attorney's Office and ultimately the judge to determine how that cooperation helps a defendant." SA Minella denied making any other statements concerning cooperation and specifically denied making any type of promises of leniency to Defendant.

The interview ended when Defendant became agitated in response to repeated questioning regarding his father and brothers. Defendant stated, "I don't want to speak with you any further," at which point the agents ceased their interrogation and transported Defendant to Durham Regional Hospital for additional treatment of his injuries. The interview lasted approximately two and a half hours.

During cross-examination, SA Minella agreed that he told Defendant "he faced being put away for the rest of [his] life in a high security prison on these charges." He denied, however, making this statement at the beginning of the interview and remembered it occurring later, after the agents sensed Defendant was being untruthful. At that point, SA Minella stressed to Defendant the seriousness of the charges and told him several times that "truthfulness can only help." SA Minella admitted that his statements to Defendant regarding truthfulness and cooperation were not reflected in the FBI Form 302. Defendant presented no evidence at the hearing, other than a copy of the FBI Form 302, introduced as Defendant's Exhibit No. 1.

SA Minella unequivocally denied (1) telling Defendant "I am here to help you, not hurt you. The person that talks to us first and who says the most is the person who gets off the easiest[;]" and (2) characterizing the Miranda waiver form as "an agreement that we're going to help you out and you are going to cooperate with us." When asked whether he had made such a statement not only to Defendant, but to any person he had ever interviewed, SA Minella replied, "Absolutely not."

M&R at 2-5 (internal citations omitted; alterations in original).

## DISCUSSION

A.  Standard of Review

The district court reviews *de novo* only those portions of a magistrate judge's analysis to which objections are filed. 28 U.S.C. § 636(b). Absent a timely objection, the court reviews only

4

for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(c).

B. Analysis

Defendant's argument has two components. First, he argues that his Miranda waiver was invalid because it was obtained through deceptive and coercive police promises of leniency. Second, he argues that his statement was not voluntary under the Fifth Amendment for similar reasons. But as the magistrate judge rightly noted, the factual predicates of these arguments find no support in the evidence before the court. Instead, SA Minella's testimony demonstrates that both the Miranda waiver and the underlying statements were obtained voluntarily, and that the agents made no coercive or improper promises of leniency.

A Miranda wavier must be "voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." United States v. Cristobal, 293 F.3d 134, 139-40 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Similarly, any statement must be voluntary under the Fifth Amendment, meaning that it is not "involuntary" within the meaning of the Due Process Clause. United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (en banc). The resulting voluntariness inquiry is identical for both Miranda waiver and Fifth Amendment purposes, and requires the court to determine "whether the defendant's will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct." Cristobal, 293 F.3d at 140 (quoting United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987)) (internal quotation marks and citation omitted).

"The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary." Braxton, 112 F.3d at 780. Instead, the court must consider the "totality of the circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. Id. at 781 (citing Pelton, 835 F.2d at 1071). The government bears the burden of proving by a preponderance of the evidence that defendant's waiver of his Miranda rights as well as any confession was knowing and voluntary. See United States v. Robinson, 404 F.3d 850, 860 (4th Cir. 2005); United States v. Locklear, 829 F.2d 1314, 1317 (4th Cir. 1987).

Here, the magistrate judge did not err in concluding that defendant's Miranda waiver and his underlying statement were voluntary under the totality of the circumstances. Before agents asked defendant any questions, he was advised of his rights, read the Miranda waiver, and signed it. He refused the agents' offer of further medical treatment for what appear to have been minor injuries sustained during his arrest, and cooperated with agents. Once agents began to suspect that defendant was being untruthful, based on inconsistencies between his statements and the evidence the agents had before them, they reminded defendant that he faced serious charges and that *truthful* cooperation could be beneficial to him. They made no promises, however, and flatly deny characterizing the Miranda waiver as any kind of "cooperation agreement."

As the magistrate judge correctly concluded, SA Minella's statement that cooperation could be beneficial and that defendant potentially faced life imprisonment do not invalidate the Miranda waiver or confession. Government agents may "tell the truth" to a defendant, by informing him of the maximum penalty for the offense charged and telling him that cooperation is usually beneficial, without rending a resulting confession involuntary. See Braxton, 112 F.3d at 782; United States v.

6

Shears, 762 F.2d 397, 401 (4th Cir. 1985). Moreover, SA Minella testified that these statements were made *after* defendant had signed the waiver, once the agents felt that defendant was giving them untruthful information. Cf. Braxton, 112 F.3d at 782 ("Admonishing a suspect to tell the truth during an investigatory interview by informing him of the statutory penalty . . . for making false statements does not constitute coercive police conduct rendering a statement involuntary.").

In addition to the specific arguments raised by counsel regarding alleged promises of leniency, the magistrate judge properly considered the other circumstances surrounding the interview in making the required voluntariness inquiry. For instance, the magistrate judge noted SA Minella's testimony that the interview was conducted in a conference room at a local police station and lasted only two and a half hours. Based on this testimony, the magistrate judge correctly determined that there was no coercion from the length of time or location of the interview.

In short, the court agrees with the magistrate judge that the government has met its burden to demonstrate by a preponderance of the evidence that defendant's Miranda waiver and interview statements were voluntary. Therefore, defendant's motion to suppress is denied.

## CONCLUSION

Upon a careful review of the M&R, the court discerns no clear error in the magistrate judge's factual findings or legal analysis, and accordingly ADOPTS the recommendation of the magistrate judge (DE # 1066). Defendant's motion to suppress (DE # 952) is DENIED.

SO ORDERED, this the 26th day of June, 2011.

LOUISE W. FLANAGAN
Chief United States District Judge